# 12-0402-CV

## United States Court of Appeals

*for the*

## Second Circuit

———————◆———————

NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, on behalf of
Steve Harvey, David Alexander, Marlon Kerner, Charles Smith, Dusty Renfro,
Michael Swift and Jason Peter,

*Petitioner-Appellee,*

– v. –

NATIONAL FOOTBALL LEAGUE MANAGEMENT COUNCIL, on behalf of
The Buffalo Bills, The New York Jets, and The Carolina Panthers,

*Respondent-Appellant,*

NEW YORK JETS, CAROLINA PANTHERS, BUFFALO BILLS,

*Respondents.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
THE HONORABLE PAUL A. CROTTY, DISTRICT JUDGE
CASE NO. 08 CIV. 3658 (PAC)

## BRIEF FOR PETITIONER-APPELLEE

JEFFREY L. KESSLER
DAVID G. FEHER
ADAM J. KAISER
JEFFREY H. NEWHOUSE
WINSTON & STRAWN LLP
*Attorneys for Petitioner-Appellee*
200 Park Avenue
New York, New York 10166
(212) 294-6700

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Petitioner/Appellee, the National Football League Players Association ("NFLPA"), a non-governmental corporate party, states that it has no parent company. There are no publicly traded companies owning more than 10% of the NFLPA's stock.

# TABLE OF CONTENTS

Table of Authorities .................................................................... ii

CORPORATE DISCLOSURE STATEMENT ...................................... 1

JURISDICTIONAL STATEMENT .................................................... 1

STATEMENT OF ISSUES ............................................................... 1

STATEMENT OF THE CASE ........................................................... 2

STATEMENT OF THE FACTS ......................................................... 8

    I.     The Collective Bargaining Agreement and Paragraph 10 of the Standard Player Contract ........................................................ 8

    II.    Prior Arbitral Awards, The Preservation of Rights Clause, And Continued Disputes ............................................................. 10

    III.   The Arbitration ................................................................. 12

    IV.   The Award Agreement and 2006 CBA ................................. 13

    V.    The Award ........................................................................ 17

    VI.   The Award is Confirmed ..................................................... 18

    VII.  Clubs Continue to Seek Dollar-for-Dollar Offsets; The March 25, 2011 Order ........................................................ 18

    VIII. The Clubs Continue To Seek Dollar-for-Dollar Offsets ......... 20

    IX.   The January 3, 2012 Order .................................................. 21

STANDARD OF REVIEW .............................................................. 22

SUMMARY OF ARGUMENT .......................................................... 22

ARGUMENT ............................................................................... 24

    I.     The NFLMC'S Appeal Is Untimely ...................................... 24

    II.    The District Court Properly Enforced Its Judgment Because The NFLMC and Clubs Continued To Violate The Confirmed Award ......... 29

    III.   The District Court Properly Determined That The Award As Confirmed Pre-Empts Inconsistent State Law ......................... 41

CONCLUSION ............................................................................ 52

# TABLE OF AUTHORITIES

Page(s)

**CASES**

Air Line Pilots v. Delta Air Lines,
863 F.2d 87 (D.C. Cir. 1988), cert. den. 493 U.S. 821 (1989) ...........................48

Alessi v. Raybestos-Manhattan, Inc.,
451 U.S. 504 (1981) ......................................................................................41, 42

Allis Chambers Corp. v. Lueck,
471 U.S. 202 (1985)..........................................................................37, 38, 47, 50

Avon Prods. v. Solow,
215 A.D.2d 247, 626 N.Y.S.2d 493 (1st Dep't 1995) .......................................31

Bottini v. Sadore Mgmt. Corp.,
764 F.2d 116 (2d Cir. 1985) ..............................................................................34

Christian v. All Persons Claiming Any Right,
No. 08-1349, 2009 WL 27428 (3d Cir. Jan. 6, 2009)........................................26

Derrico v. Sheehan Emergency Hosp.,
844 F.2d 22 (2d Cir. 1988) ...........................................................................42, 43

Diaz v. San Jose Unified Sch. Dist.,
861 F.2d 591 (9th Cir. 1988) .............................................................................26

Dulce v. Dulce,
233 F.3d 143 (2d. Cir. 2000)..............................................................................29

Eagle Iron Works v. Int'l Ass'n of Machinists,
No. 4-01-CV-90159, 2001 WL 1678741 (S.D. Iowa Nov. 26, 2001)...............48

Florasynth, Inc. v. Pickholz,
750 F.2d 171 (2d Cir. 1984)...............................................................................30

Gage v. Astrue,
No. 10-1159, 2010 WL 5023220 (7th Cir. Dec. 10, 2010) ...............................26

Green v. New Orleans Saints,
781 So.2d 1199 (La. 2000) ....................................................................46, 47, 49

Goode v. Winkler,
252 F.3d 242 (2d Cir. 2001) ..............................................................................28

Hines v. Anchor Motor Freight, Inc.,
424 U.S. 554 (1976).............................................................................................47

Hull v. Dutton,
  935 F.2d 1194 (11th Cir. 1991) ..........................................................44

In re Joint E. & S. Dist. Asbestos Litig.,
  993 F.2d 313 (2d Cir. 1993) ..............................................................22

In re Jones Dairy Farm,
  295 N.L.R.B. 113 (N.L.R.B. June 15, 1989) .....................................45

In re Kohler Mix Specialties, Inc.,
  332 N.L.R.B. No. 61 (N.L.R.B. Sept. 29, 2000) ...............................45

In re Lang,
  414 F.3d 1191 (10th Cir. 2005) ..........................................................25

Inmates of Suffolk Cnty. Jail v. Eisenstadt,
  494 F.2d 1196 (1st Cir. 1974) .............................................................25

Keach v. Cnty. of Schenectady,
  593 F.3d 218 (2d Cir. 2010) ...............................................................24

Local 24 of the Int'l Bhd. of Teamsters v. Oliver,
  358 U.S. 283 (1959) ...................................................................42, 44

Lodge 76, Int'l Ass'n of Machinists and Aerospace Workers v. Wis. Emp.
  Relations Comm'n,
  427 U.S. 132 (1976) ................................................................*passim*

Major League Baseball Players Ass'n v. Garvey,
  532 U.S. 504 (2001) ...........................................................................47

Met. Life Ins. Co. v. Mass. Travelers Ins. Co.,
  471 U.S. 724 (1985) .....................................................................42, 45

Nelson v. Victory Elec. Works, Inc.,
  338 F.2d 994 (4th Cir. 1964), aff'g 227 F. Supp. 404 (D. Md. 1964) ...............43

Ottley v. Schwartzberg,
  819 F.2d 373 (2d Cir. 1987) .........................................................33, 34

Railway Employees' Dep't v. Hanson,
  351 U.S. 225 (1956) ...........................................................................44

Riggs v. Johnson Cnty.,
  73 U.S. (6 Wall.) 166, 18 L.Ed. 768 (1867) .....................................29

Robert Lewis Rosen Assocs., Ltd. v. Webb,
  473 F.3d 498 (2d Cir. 2007) ...............................................................34

Rondout Electric, Inc. v. NYS Dep't of Labor,
    335 F.3d 162 (2d Cir. 2003) ................................................................45

San Francisco Elec. Contractors Ass'n Inc. v. Int'l Bhd. of Elec. Workers,
    Local No. 6,
    577 F.2d 529 (9th Cir. 1978) .......................................................32, 39

Tampa Bay Area NFL Football, Inc. v. Jarvis,
    668 So. 2d 217 (Fla. Dist. Ct. App. 1996)...................................43, 46

Teamsters v. Lucas Flour Co.,
    369 U.S. 95 (1962).............................................................................50

Trailways Lines, Inc. v. Trailways, Inc. Joint Council,
    807 F.2d 1416 (8th Cir. 1986) ..........................................................49

United States v. N.Y. Tel. Co.,
    434 U.S. 159 (1977)...........................................................................33

United Steelworkers of Am. v. Warrior and Gulf Navigation Co.,
    363 U.S. 574 (1960)...........................................................................48

Vera v. Saks & Co.,
    335 F.3d 109 (2d Cir. 2003) ............................................................22

Zeiler v. Deitsch,
    500 F.3d 157 (2d. Cir. 2007) ........................................31, 34, 35, 39


**FEDERAL STATUTES**

28 U.S.C. § 1291 ......................................................................................1

28 U.S.C. § 1331 ......................................................................................1

28 U.S.C. § 1651......................................................................................32

28 U.S.C. § 2202......................................................................................32

29 U.S.C. 158(d) ....................................................................................44

29 U.S.C. § 151........................................................................................42

29 U.S.C. § 185........................................................................................1

**RULES**

Federal Rule of Appellate Procedure 26.1 ...............................................1

**OTHER AUTHORITIES**

30 Am. Jur. 2d Executions § 3 (2010).....................................................29

Elkouri & Elkouri, <u>How Arbitration Works</u> 579 (Alan Miles Rubin ed.,
    BNA Books 6th ed. 2003).................................................................48

Wright & Miller, 15B Fed. Prac. & Proc. Juris. § 3916 (2d ed. 2012)...................26

Oehmke, 4 Commercial Arbitration § 134:11 (2010)...........................................30

Zack & Block, Labor Arbitration in Negotiation and Arbitration (2nd ed.
    1995) ................................................................................................48

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Petitioner/Appellee, the National Football League Players Association ("NFLPA"), a non-governmental corporate party, states that it has no parent company. There are no publicly traded companies owning more than 10% of the NFLPA's stock.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. § 1331 to decide the motion for contempt filed by the NFLPA against the National Football League Management Council ("NFLMC") under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. The district court entered a final order on January 3, 2012, denying the motion for contempt and clarifying a permanent injunction entered on March 25, 2011. The NFLMC timely filed its notice of appeal from the district court's ruling on the motion for contempt on January 30, 2012, but it did not timely file its appeal of the pre-emption or any other ruling contained in the March 25, 2011 Order. This Court has jurisdiction over the NFLMC's appeal of the motion for contempt under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.     Did the NFLMC timely appeal the district court's Judgment, dated March 25, 2011, that held that federal labor law pre-empted any state law claims by the NFLMC and Clubs for a dollar-for-dollar offset against workers'

compensation benefits when the time for appealing that Judgment has long since passed?

2.     Assuming the appeal is timely, did the district court err in: (i) declaring that the arbitral award enforcing Paragraph 10 of the Standard Player Contract, that is part of the NFL Collective Bargaining Agreement ("CBA"), pre-empts state law; and (ii) enjoining the NFL Clubs from seeking dollar-for-dollar state law offsets to workers' compensation benefits that are precluded by the confirmed arbitral award enforcing Paragraph 10?

3.     Did the district court correctly conclude that the terms of the NFL CBA, as set forth in Paragraph 10 of the Standard Player Contract, pre-empt inconsistent state law which provides for lesser workers' compensation benefits to NFL Players than those provided for in the CBA?

<u>**STATEMENT OF THE CASE**</u>

This untimely appeal involves a decades old dispute over Paragraph 10 of the Standard Player Contract contained in the NFL CBA, which every NFL Club and every NFL Player must enter into pursuant to the requirements of the NFL CBA. Paragraph 10 addresses the extent to which NFL Clubs may seek to offset, or reduce, an injured Player's state workers' compensation award as a consequence of the fact that the Player is receiving salary from his NFL Club while injured. Over the course of many years, multiple NFL CBA Arbitrators have ruled

that Paragraph 10 limits NFL Clubs to only a "time" offset against state workers' compensation awards. The Clubs, however, have maintained that they should be permitted to seek a broader "dollar-for-dollar" offset, which would, in effect, wipe out a Player's entire workers' compensation award.[1]

Every NFL labor arbitrator that has considered this issue has ruled in favor of the Players, finding that Paragraph 10 precludes the Clubs from seeking anything more than a limited time offset to workers' compensation awards. See A49. The Clubs, however, have consistently ignored the arbitral awards interpreting Paragraph 10 as limiting them to only a time offset, and have continued to seek dollar-for-dollar offsets in state workers' compensation

---

[1] When a worker gets injured, his state workers' compensation award is usually measured by a number of weeks multiplied by a statutory amount. Under some state's laws, employers who continue paying salary to an injured worker are entitled to offset the compensation award by some amount of the salary paid to the employee during the period of injury. In the NFL, injured Players continue receiving their salary for a period of time. Under the "time" offset provision in Paragraph 10, a Club's right to offset the workers' compensation award is limited to those weeks when the Player receives both workers' compensation benefits and salary. Thus, for example, if a Player is injured with six weeks left in the season and receives a workers' compensation award of 100 weeks, the Club would only be entitled to offset the workers' compensation award by six weeks. The Player would thus receive 94 weeks of benefits. The "dollar-for-dollar" offset is much broader. Under such an offset, an employer is entitled to an offset from the workers' compensation award equal to every dollar of salary the employer paid the worker after he was injured. Because salaries in the NFL are high, the practical effect of a dollar-for-dollar offset would be that most Players would never receive any benefits under state workers' compensation awards. Paragraph 10 is a collectively bargained benefit for NFL Players that prevents NFL Clubs from eliminating workers' compensation benefits through dollar-for-dollar offsets.

proceedings in states, like New York, where such offsets were arguably authorized under state law. The Clubs maintained in these state law proceedings that labor arbitral awards interpreting Paragraph 10 were either erroneous, not binding on them, or both.

The Clubs also argued in state workers' compensation proceedings, as they do here, that even if Paragraph 10, which is a collectively bargained provision, provides for only a limited time offset, the Clubs are still entitled to seek greater offsets if permitted by state law. The Clubs based their argument on a provision in the CBA referred to as the "Preservation of Rights" clause (CBA Art. LIV, Sec. 5) that, according to the Clubs, allowed them to seek dollar-for-dollar offsets regardless of what Paragraph 10 says.

In 2005, after years of the Clubs refusing to abide by the arbitral awards interpreting Paragraph 10, and endless litigation in state workers' compensation proceedings over the effect of these arbitral awards, the NFLPA commenced a new grievance (against the NFLMC and Buffalo Bills, New York Jets, and Carolina Panthers), specifically requesting the Arbitrator to issue a declaration that Paragraph 10 only provided for a limited time offset, and that Paragraph 10, being a collectively bargained for right, pre-empted any state law that would allow a Club to seek a broader dollar-for-dollar offset.

The arbitration was held on January 10, 2006. Soon thereafter, however, the NFLMC and NFLPA began negotiations over a new collective bargaining agreement, which ultimately culminated later that year into a new CBA ("2006 CBA"). Both sides agreed that it would disrupt the negotiations if the Arbitrator issued his award, because the issue of workers' compensation offsets was being further addressed in the 2006 CBA at the bargaining table. Hence, the parties entered into a letter agreement, which we refer to as the "Award Agreement," providing that the arbitral award would not be unsealed until July 1, 2007, and that it would only go into effect beginning with the Final League Year under the new 2006 CBA. See A87-88. Prior to the Final League Year, the parties' agreement on workers' compensation offsets set forth in the 2006 CBA would apply.

The Award Agreement did more than just delay issuance of the arbitral award and make it effective beginning with the Final League Year of the 2006 CBA. It also resolved the issue of whether the award would be binding on all Clubs in subsequent proceedings, or whether Clubs could continue to seek greater offsets if permitted by state law by arguing for the ability to do so under the Preservation of Rights clause. Specifically, the Award Agreement clearly provided that the arbitral award would be final and bind all Clubs and Players "notwithstanding" the Preservation of Rights clause. The parties thus agreed to

have the Arbitrator resolve this issue once and for all. The parties would no longer litigate over the offset issue in workers' compensation tribunals all over the country. To the contrary, this arbitral award would settle the issue for all Players and all NFL Clubs commencing with the Final League Year of the 2006 CBA.

The arbitral award was unsealed in 2007 (the "Award"). The Players once again prevailed on the meaning of Paragraph 10. The Arbitrator ruled that Paragraph 10 provided only for a limited "time" offset. The Arbitrator, however, refused to rule on whether Paragraph 10 and the arbitral Award would pre-empt all contrary state laws that permitted employers to seek broader dollar-for-dollar offsets. Although the Arbitrator held that the limited time offset was "a benefit or right to the player, as well as the Club; and that this is the law of the shop under this CBA and is binding on all the Clubs" (A63), the Arbitrator stated that whether Paragraph 10 pre-empted inconsistent state laws that provided for dollar-for-dollar offsets "is a matter to be decided in the appropriate state or federal forum, not arbitration under the CBA." A62. "[T]he preemption issue is one to be decided by the courts." A63. The NFLPA timely sough confirmation of this Award, which was granted by the district court over the NFLMC's objections. See A170-76.

As explained above, by agreement of the parties, the Award did not go into effect until the Final League Year of the 2006 CBA. The NFL exercised its right to unilaterally terminate the 2006 CBA ahead of schedule, and the Final

League Year began in 2010.  See A87-88.  In 2010, however, the Clubs disavowed the Award, as well as the Award Agreement.  Indeed, shortly after the district court entered its Judgment confirming the Award, the Buffalo Bills and New York Jets once again sought dollar-for-dollar offsets in state workers' compensation tribunals.  See Docket Entry ("DE") 26, at ¶¶ 6-8, Exhs. A & B.  The Clubs maintained that the Award had no pre-emptive effect.  This issue was then presented to the district court as part of the motion to enforce the Award.  As the Arbitrator ruled, the pre-emptive effect of the Award was "a matter to be decided in the appropriate state or federal forum, not arbitration under the CBA."  See A62.

The NFLPA moved to enforce the confirmed Award, arguing it pre-empted any inconsistent state laws.  On March 25, 2011, the district entered an Order first noting that the Arbitrator left the issue of the Award's pre-emptive effect to the courts.  See SPA3.  The Court then ruled that "[t]he Court now holds that the Award preempts" the Clubs' interpretation of Paragraph 10.  See SPA3.  The district court also entered a permanent injunction, prohibiting the Clubs from seeking dollar-for-dollar offsets to state workers' compensation benefits that were inconsistent with the terms of the binding Award.  See SPA4.

The Clubs did not appeal the March 25, 2011 Order.  Nor did they seek clarification of it.  Rather, the Clubs unilaterally, and erroneously, gave the March 25, 2011 Order a narrow and unsupportable gloss, interpreting it to mean

that they could still seek dollar-for-dollar offsets under state law notwithstanding the Award.

The NFLPA then moved the district court to hold the NFLMC and Bills in contempt for failing to comply with the injunction issued by the district court. While denying the motion for contempt because of a perceived lack of clarity in the terms of the prior injunction, the district court issued an order which further clarified the terms of the prior injunction. <u>See</u> SPA5-7. Despite having prevailed in this Order, the NFLMC then brought what is in reality an untimely appeal of the issues decided in the prior March 25, 2011 Order.

<h2 style="text-align:center"><u>STATEMENT OF FACTS</u></h2>

## I. The Collective Bargaining Agreement and Paragraph 10 of the Standard Player Contract.

NFL Players who are injured while working for the Clubs are entitled to certain injury-related benefits under the CBA between the NFLPA and the NFLMC, as well as under the Standard Player Contract that is part of the CBA and which each NFL Player and NFL Club is required to enter into. These collectively-bargained for benefits include: (1) injury protection under the CBA (limited salary for the season following the season of injury) and (2) salary continuance under Paragraph 9 of the Standard Player Contract (full salary for the season of injury).

NFL Players, like other workers, are also entitled to seek injury-related benefits under state workers' compensation laws. Because the CBA does not provide any long-term medical benefits for injured Players, and state workers' compensation regimes do, NFL Players rely heavily on state workers' compensation laws for such health care for their NFL injuries, as well as for compensation for long-term injuries sustained in the line of their work for NFL Clubs.

Injured NFL Players thus may receive both collectively-bargained for injury benefits and state workers' compensation benefits. The Clubs fund both benefits, and the CBA provides that where Clubs pay both benefits, they are entitled to a limited time offset of one against the other. Specifically, Paragraph 10 of the Standard Player Contract, which has applied to every Player's contract with every Club since 1977 (A46), entitled "Workers' Compensation," governs any "credit" or "offset" to which a Club may be entitled to against any workers' compensation benefits received by a player:

> Any compensation paid to a Player under this contract or under any collective bargaining agreement in existence during the term of this contract for a period during which he is entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial, or permanent partial disability will be deemed an advance payment of workers' compensation benefits due Player, and Club will be entitled to be reimbursed the amount of such payment out of any award of workers' compensation.

A36-37. As explained below, the above sentence has spawned decades of arbitrations and disputes in state workers' compensation tribunals. In particular, the parties have taken diametrically opposed views as to the meaning of the phrase "during the term of this contract for a period during which he is entitled to workers' compensation benefits." Under the NFLMC's view, this language allows Clubs to seek a dollar-for-dollar offset. Under the NFLPA's view, it allows only for a limited time offset.

## II. Prior Arbitral Awards, The Preservation of Rights Clause, and Continued Disputes.

Prior to the Award that eventually led to these proceedings, the meaning of Paragraph 10 was argued and ruled upon in numerous labor arbitral awards. All of those awards found that the Club was only entitled to a limited time offset. See A49. The most important of these arbitral proceedings, discussed at length in the Award (A57-63), is Freeman v. Oakland Raiders (Kagel 1994). In Freeman, the Raiders contended that they were entitled to a dollar-for-dollar offset, regardless of the period for which the Player received his workers' compensation payments. The Player argued the Club was only entitled to a limited time offset, and the Arbitrator agreed. See A48-49. Significantly, "[n]o arbitrator has since disagreed." See A49.

Despite the repeated arbitral awards interpreting Paragraph 10 in favor of the Players, a number of Clubs continued to argue in state workers'

compensation courts that they were entitled to full dollar-for-dollar offsets. <u>See</u> A62. The NFLMC and NFLPA, while not parties to theses state workers' compensation proceedings, supported their members in this legal fight. <u>See</u> A62.

The Clubs' position after the arbitral decision in <u>Freeman</u> was as follows. They claimed <u>Freeman</u> was not binding in state workers' compensation tribunals, or only bound the Raiders. They claimed <u>Freeman</u> was erroneous. They also claimed that the Preservation of Rights clause of the CBA (A49), added in 1993 (A56), preserved their ability to seek greater dollar-for-dollar offsets under state law, regardless of what the parties collectively bargained for in Paragraph 10. <u>See</u> A56. The Clubs argued that the Preservation of Rights clause in the CBA permitted them to seek much broader dollar-for-dollar offsets in states that allowed this, while also permitting them to obtain time or even dollar-for-dollar offsets, pursuant to Paragraph 10, in states where no offsets would otherwise be allowed. It was a "heads I win, tails you lose" assertion in which Paragraph 10 was a benefit for the Clubs, without being a restriction to protect the Players.

The NFLPA, on the other hand, argued that the Preservation of Rights clause had no application to the offset issue after <u>Freeman</u> was decided. The reason was that the NFL Arbitrator in <u>Freeman</u> had definitively interpreted Paragraph 10 as a collectively-bargained benefit for the Players which limited the Clubs to a time offset. And <u>Freeman</u> was the law of the shop and binding on all

Clubs in all workers' compensation cases. Accordingly, it would subvert federal labor law if the Clubs could seek a state law offset greater than the offset the parties bargained for in their CBA.

As the Arbitrator noted, the parties litigated these issues for 12 years following <u>Freeman</u> in workers' compensations cases throughout the country. <u>See</u> A62. This resulted in state administrative law judges being inappropriately required to interpret the CBA, Paragraph 10 of the Standard Player Contract, the Preservation of Rights clause, numerous arbitral decisions, federal labor law and varied state laws in an effort to determine what offset rules to apply. The results were massive uncertainty and inconsistency of treatment – the very opposite of what the CBA and federal labor law requires. The NFLPA filed the arbitration below to resolve this issue once and for all.

## III. The Arbitration.

In May 2005, the NFLPA filed a grievance against the Buffalo Bills, New York Jets, and the NFLMC, based on claims asserted in state workers' compensation tribunals by the Bills and Jets to offset against any workers' compensation award the dollar-for-dollar amount of "injury protection" and "salary continuation" benefits paid to NFL players Steve Harvey and David Alexander. In September 2005, the NFLPA filed a separate grievance against the Carolina Panthers alleging a similar violation of Paragraph 10 of the Standard Player

Contract. At the same time, the NFLPA filed an amended grievance to include NFL player Marlon Kerner as an additional grievant in the arbitration against the Bills and Jets. The NFLPA's grievance against the Panthers was consolidated with the grievance against the Bills and Jets, and a hearing was held on January 10, 2006 before Shyam Das, an arbitrator mutually selected by the NFLPA and NFLMC pursuant to the CBA.

The grievance sought several forms of relief: (1) a declaration that Freeman was the law of the shop and binding on all Players and Clubs and (2) "a declaration that to the extent any state statute purports to create a greater offset," it "diminishes a contractual benefit" and thus "is preempted" under federal labor law by the CBA  See A52. As they did in the past, the Clubs maintained in the grievance that the Preservation of Rights clause precluded any finding of pre-emption. See A56. According to the Clubs, the Preservation of Rights clause meant that, whatever offset Paragraph 10 allowed, the Clubs had a contractual right to avail themselves of any greater offset provided by state law.

## IV. The Award Agreement and 2006 CBA.

Following the close of the hearing on January 10, 2006, but prior to the issuance of the Award, the NFLMC and NFLPA commenced negotiations for an extension of their CBA. Negotiations were conducted throughout 2006, culminating in a new CBA in late 2006. Workers' compensation offsets was one

of the subjects at the bargaining table, and both the NFLMC and NFLPA believed that it would make negotiations more difficult to know who won the Arbitration. As a result, the parties to the CBA agreed that Arbitrator Das would keep his decision secret while the parties negotiated a new CBA.

On October 10, 2006, after instructing the Arbitrator earlier in the year not to release his Award, the NFLMC and NFLPA entered into an agreement concerning the Award and its effect (the "Award Agreement"). <u>See</u> A87-88. Pursuant to the Award Agreement, Arbitrator Das's Award would be kept in a sealed envelope until it would be released on July 1, 2007.

The parties also agreed, in the Award Agreement, that Arbitrator Das's arbitral Award would not go into effect until the "Final League Year," which is the last year of the CBA (and the only one without a Salary Cap). At that point, absent any further agreement between the parties, it would become binding on all Clubs and Players. <u>See</u> A87-88.

Significantly, the parties agreed in the Award Agreement that the Award would trump any future argument by the Clubs under the Preservation of Rights clause that the Award should not be binding upon them for all Players. In other words, both parties agreed that fighting these same battles over and over again in state tribunals was costly, counterproductive and inefficient, and that all

parties would be bound by whatever was decided in the Award by Arbitrator Das.

In the words of the Award Agreement:

> The opinion and award in <u>Alexander</u> will not <u>go into effect</u> until the beginning of the Final League Year, at which time, <u>notwithstanding the provisions of art. LIV, sec. 5 of the CBA [Preservation of Rights]</u>, as amended, <u>the opinion and award will constitute the full, final and complete disposition of the grievance and will be binding upon the Players and Clubs and the parties to this Agreement</u> as set forth in CBA art. IX, sec. 8, as amended.

<u>Id.</u> (emphasis added). The NFLMC's brief barely mentions the Award Agreement, but it is the critical legal document that precludes their "Preservation of Rights" clause argument.

The parties did negotiate a new 2006 CBA, containing a new, comprehensive workers' compensation provision that addressed the issue of offsets during every year but the Final League year. Under the 2006 CBA, Clubs were only entitled to the limited time offset during the Salary Capped years prior to the Final League Year. Section 4 of Article LIV of the 2006 CBA addressed this issue as follows:

> **Workers' Compensation Offset Provisions:** The parties agree that the following provisions shall exclusively govern any and all rights Clubs have with respect to workers' compensation credits or offsets during the remaining Capped Years of this Agreement.
>
> (i) **"Dollar-for-Dollar" Credits or Offsets.** <u>No Club shall be entitled to claim or receive any dollar-for-dollar</u>

15

credit or offset for salary, benefits, or other compensation paid or payable to a Player against any award or settlement of workers' compensation benefits, either pursuant to Paragraph 10 of the NFL Player Contact or any provision of state law.

(ii) **"Time" Credits or Offsets.**  All Clubs are instead entitled only to a "time" credit or offset under Paragraph 10 of the NFL Player Contract or state law . . . .  This "time" credit or offset shall in all cases be expressed or granted as a reduction in the number of weeks of a Player's workers' compensation award or settlement that is attributable to the same period of weeks in which the Player is deemed entitled to salary payments or CBA benefits as described in this Section.

A108.

The 2006 CBA also required that all pending workers' compensation cases be settled in accordance with the 2006 CBA.  Even if a Club would be entitled to a dollar-for-dollar offset under state law, the Club agreed to limit itself in pending cases to the time offset as provided in Article LIV, Section 4 of the 2006 CBA.  The workers' compensation claims of the players involved in the underlying grievance were resolved as "pending cases" under Article LIV, Section 4.  While this bargained-for process was a great success, it came to an end in 2010 when the NFL exercised its right to terminate the CBA early, thus leading to the Final League Year, in which the Award became effective.

## V.    The Award.

On February 14, 2007, Arbitrator Das issued a written final Award in the underlying arbitration.  He ruled that Paragraph 10 provided for a time offset only.  See A63-64.  Arbitrator Das found that the previous binding arbitral decision in Freeman "squarely held that Paragraph 10 only provides for a time offset, and not for a dollar-for-dollar offset."  A57.  The Award declared that "[t]he decision in Kyle Freeman v. Oakland Raiders (Kagel 1994) holds that Paragraph 10 of the NFL Player Contract provides only for a time offset, and not for a dollar-for-dollar offset; this is a benefit or right to the player, as well as the Club; and this is the law of the shop under this CBA and is binding on all the Clubs."  See A64.  Arbitrator Das thus ruled that "a Club which has paid salary continuance and/or injury protection to a player who subsequently receives an award of workers' compensation would be entitled to be reimbursed on a time offset basis under Paragraph 10."  See A58.

Arbitrator Das, however, declined to rule whether Paragraph 10 or the Award pre-empted state laws that allowed for dollar-for-dollar offsets.  He held that "the preemption issue is one to be decided by the courts."  See A63.  Arbitrator Das's decision not to decide the pre-emption issue was by that time academic, because, under the Award Agreement, the parties agreed that the Award would be the law of the shop and would go into effect without regard to the

Preservation of Rights clause. That is, in the Award Agreement, the NFLMC agreed that all Clubs would abide by Arbitrator Das's Award commencing in the Final League year of the 2006 CBA notwithstanding any rights they may claim to have had under the Preservation of Rights clause to seek greater offsets under state laws. See A87-88.

## VI. The Award is Confirmed.

On March 26, 2009, the district court issued an Order granting, over the NFLMC's repeated objections, the NFLPA's petition to confirm the Award. See A170-176. Judgment was entered in favor of the NFLPA on March 29, 2009. See A177. The Judgment provided that "Paragraph 10 of the NFL Player Contract provides only for a time offset, and not for a dollar-for-dollar offset." Id. The NFLMC did not appeal that judgment, which was binding on all NFL Clubs who were parties to the CBA.

## VII. Clubs Continue to Seek Dollar-for-Dollar Offsets; The March 25, 2011 Order.

Notwithstanding the Award, the Award Agreement and the district court's Order and Judgment, a number of Clubs persisted in claiming dollar-for-dollar offsets in state workers' compensation proceedings. See DE-26, at ¶¶ 6-8, Exhs. A & B. Thus, the NFLPA filed a motion to enforce the Judgment on June 24, 2010. See A178-93. The NFLPA's motion sought a permanent injunction

against the NFLMC and all NFL Clubs to prevent them from seeking or obtaining dollar-for-dollar offsets against NFL players.  See A180-81.

The NFLMC resisted that motion by, once again, relying on the Preservation of Rights clause.  See A203, A207.  The NFLMC ignored, just as it does here, the Award Agreement making that clause inapplicable.  The NFLMC also argued that the NFLPA needed to file yet another grievance (A205) and that the district court lacked the authority to further enforce the Award.  See A209.  In response, the NFLPA argued that the Award Agreement precluded the NFLMC's arguments, and that, in any event, Arbitrator Das left the pre-emptive effect of the Award up to the courts, and that the court should declare that the Award enforcing the CBA was entitled to pre-emptive effect under governing labor law precedent. See A231.

On March 25, 2011, the district court granted the NFLPA's motion.  It held that Paragraph 10, as interpreted in the Award, "defines the 'offset' that NFL Clubs are permitted to take from injured NFL players' state workers' compensation award."  See SPA1.  The district court further held "that the Award preempts any attempts by Management to persist in interpreting Paragraph 10 of the CBA to provide for dollar-for-dollar offsets."  See SPA3.  The NFLMC did not appeal the March 25, 2011 Order, or seek clarification of its meaning.  Rather, it decided to forego its right to file a timely appeal in favor of ignoring the Order altogether.

## VIII.  The Clubs Continue To Seek Dollar-for-Dollar Offsets.

Undeterred by the permanent injunction entered on March 25, 2011 – from which it did not appeal – the Buffalo Bills again sought dollar-for-dollar offsets before state workers' compensation tribunals.  The Bills and the NFLMC argued that the Award, Judgment and Court Orders dealt only with Paragraph 10, and did not alter the NFLMC's or a Club's ability to resort to state law where it was more favorable to them.  See SPA6.

On May 3, 2011, the NFLPA moved to hold the NFLMC and the Bills in civil contempt because they intentionally violated the district court's Judgment and Orders.  See A234-44.  In response, the Clubs first claimed that the March 25, 2011 Order was unclear.  See A251.  They pointed to the language in the Order, "Management is hereby enjoined from attempting to assert dollar-for-dollar offsets under Paragraph 10" and argued that it could have meant one of two things:  that Paragraph 10 precluded the Clubs from seeking dollar-for-dollar offsets, or that the Clubs could not seek offsets under Paragraph 10 but could still do so under state law.  See A253.  The Bills did not explain, however, why, if the Club found the March 25, 2011 Order confusing, it did not seek clarification from the district court, or appeal from it.  Nor did the Club explain why, if that Order could have two meanings, it would unilaterally adopt the narrowest one and risk contempt.

Although the time to seek reconsideration had long passed, the Clubs also made a plea for the Court to reconsider its pre-emption ruling in its March 25, 2011 Order. The Clubs argued that pre-emption did not apply "because the parties expressly bargained for a separate provision preserving the right of each to continue to pursue all remedies provided by state law." <u>See</u> A256. Again, the Clubs failed to address the binding Award Agreement under which the parties agreed that the Preservation of Rights clause would have no application to this dispute and that the parties would follow the Award once it became effective in the Final League Year. <u>See</u> A87-88.

## IX.   The January 3, 2012 Order.

On January 3, 2012, the district court entered an Order denying the NFLPA's motion for contempt but also stating that the Bills were "sadly mistaken" in interpreting the March 26, 2009 and March 25, 2011 Orders so narrowly. <u>See</u> SPA6. The district court held that to the extent its March 25, 2011 Order may not have been clear enough to support a finding of contempt, it would clarify that the Award pre-empted state law, so that, in the future, Clubs clearly know that they are not entitled to seek dollar-for-dollar offsets under state laws. Specifically, the Court stated that, "[i]n addition to providing for a time offset, Paragraph 10 of the Player's Contract pre-empts any state law to the contrary. Management shall not attempt to assert a dollar-for-dollar offset, under state law or otherwise, for players

whose claims are governed by the Players' Contract. Any further attempt to enforce a right which neither Management nor any individual Club possesses may result in sanctions." SPA7. This appeal followed.

## STANDARD OF REVIEW

This appeal raises only questions of law. This Court reviews <u>de novo</u> a district court's decision to exercise declaratory jurisdiction, <u>In re Joint E. & S. Dist. Asbestos Litig.</u>, 993 F.2d 313, 314 (2d Cir. 1993), and a district court's application of federal labor law pre-emption principles to a conflicting state law, <u>Vera v. Saks & Co.</u>, 335 F.3d 109, 113-14 (2d Cir. 2003).

## SUMMARY OF ARGUMENT

The NFLMC's appeal is untimely and should be dismissed. The district court held that the Award pre-empted inconsistent state laws on March 25, 2011. SPA3 ("[T]he Award preempts any attempts by Management to persist in interpreting Paragraph 10 of the CBA to provide for dollar-for-dollar offsets."). The NFLMC did not file this appeal until January 30, 2012, which is out of time. Under settled law, the NFLMC cannot seek review of the March 25, 2011 Order simply because that Order was clarified in a later January 2012 Order in which the motion for contempt filed by the NFLPA was denied (and thus the NFLMC had no adverse decision from which to appeal).

If this Court concludes the NFLMC's appeal is timely, it should nonetheless deny its appeal on the merits. The district court properly ruled, consistent with basic principles of federal labor law and the binding terms of the Award Agreement, that the Award's construction and enforcement of Paragraph 10 is entitled to pre-emptive effect and displaces inconsistent state laws that provide lesser benefits to the NFL players.

None of the arguments advanced by the NFLMC to challenge the district court's pre-emption decision have any merit. In arguing that the district court should not have ruled on the pre-emption issue, the NFLMC ignores the fact that the Award itself expressly left the issue of the pre-emptive effect of the Award to the courts. Further, the NFLMC has previously acknowledged that the CBA pre-empts state workers' compensation laws that provide greater offsets to the Clubs under the very same pre-emption authorities relied upon by the NFLPA before the court below. It is completely disingenuous for the NFLMC to now claim that those cases are not applicable. Similarly, the NFLMC's argument that there was not a case or controversy to support judicial relief has no merit. The Clubs asserted the same state law defenses in workers' compensation tribunals that they were expressly prohibited from asserting by the Award and thus created a live controversy. Finally, as the district court correctly noted, any reliance on the Preservation of Rights clause by the Clubs is a "red herring." <u>See</u> SPA4. The

NFLMC's reliance upon that clause as a basis to attack the pre-emptive scope of the Award is, among other things, precluded by the terms of the Award Agreement.

<u>**ARGUMENT**</u>

## I. THE NFLMC'S APPEAL IS UNTIMELY.

In an effort to camouflage the untimeliness of this appeal, the NFLMC claims to be appealing from the last (and shortest) of the district court's three orders, the January 3, 2012 Order. But there is nothing to appeal from in that Order – the NFLMC defeated the NFLPA's motion for contempt, and a party cannot appeal from an Order that it won. <u>See</u>, <u>e.g.</u>, <u>Keach v. Cnty. of Schenectady</u>, 593 F.3d 218, 223 (2d Cir. 2010) ("[i]t is a fundamental principle of jurisprudence that '[a] party may not appeal from a judgment or decree in his favor, for the purpose of obtaining review of findings he deems erroneous which are not necessary to support the decree.'") (citations omitted).

In the January 3, 2012 Order, the district court denied the NFLPA's motion for contempt and held that the Bills were not proceeding in "bad faith" because the previous Order could "be susceptible to the interpretation that Management still had certain prerogatives under the reservation of rights provision." <u>See</u> SPA7. Thus, the district court ruled in favor of the NFLMC and the Bills, at the same time that it "clarifie[d] the Order's meaning." <u>Id</u>. But the

judicial act of clarifying a previous order, by then 10 months old, does not allow a party to appeal the previous order. If it did, then parties could extend their time for appeal by simply filing motions for clarification and then appealing that decision, or worse, violating an Order and then seeking to justify that malfeasance by claiming some ambiguity in the initial order, and then appealing. There is no authority cited by the NFLMC which would support finding a timely appeal in these circumstances.

Further, the NFLMC does not explain why, if it believed the March 25, 2011 Order was ambiguous, it did not seek clarification then, or simply appeal it. Either would have been easy to do. But the NFLMC did not seek clarification from the district court, or appeal that order. Instead, it made a strategic decision not to appeal, and it must now bear the consequences of that failure to file a timely appeal.

It is well-established that parties may not use supplemental orders as a basis to appeal an earlier order; each appeal must be timely filed and must be limited to the precise issues addressed in the Order being appealed from. See Inmates of Suffolk Cnty. Jail v. Eisenstadt, 494 F.2d 1196, 1199 (1st Cir. 1974) (on appeal from a supplemental order implementing the judgment by compelling specified steps, "the underlying judgment is immune from attack"); In re Lang, 414 F.3d 1191, 1196 (10th Cir. 2005) ("The scope of this stand-alone appeal 'should be

restricted to the questions properly raised by the post-judgment motion [and] should not extend to revive lost opportunities to appeal the underlying judgment'") (citation omitted); Diaz v. San Jose Unified Sch. Dist., 861 F.2d 591, 594 (9th Cir. 1988) (plaintiffs could appeal an order approving a 1988-89 school desegregation implementation plan adopted under a final decree entered in 1985, but it was too late to secure review of the final 1985 decree); Gage v. Astrue, No. 10-1159, 2010 WL 5023220, at *1-2 (7th Cir. Dec. 10, 2010) (appeal was timely only as to an order denying a post-judgment motion because appellant had failed to appeal the judgment within the required period); Christian v. All Persons Claiming Any Right, No. 08-1349, 2009 WL 27428, at *1 (3d Cir. Jan. 6, 2009) (affirming post-judgment order because "the only challenges raised by appellant before us are challenges not to the order of December 27, 2007, but rather to the District Court's final order of June 14, 2005, which appellant failed to timely appeal"); Wright & Miller, 15B Fed. Prac. & Proc. Juris. § 3916 (2d ed. 2012) ("The finality of many postjudgment orders should not be allowed to obscure the rule that appeal from a postjudgment order does not revive a lost opportunity to appeal the judgment or earlier postjudgment orders. Appeal is limited to new questions raised by the postjudgment order itself . . . .").

As explained in its March 25, 2011 and January 3, 2012 Orders, the district court, in fact, decided all of the issues raised in this appeal in its March 25,

2011 Order. <u>See</u> SPA6 ("The Buffalo Bills nevertheless maintain that the Orders of March 26, 2009 and March 25, 2011 deal only with Paragraph 10; and do not alter Management's or a Club's ability to resort to state law where it is more favorable to them. The Buffalo Bills are sadly mistaken."); SPA3 ("[T]he Award preempts any attempts by Management to persist in interpreting Paragraph 10 of the CBA to provide for dollar-for-dollar offsets."). Accordingly, the NFLMC's appeal is untimely and this Court does not have jurisdiction to address it.

Indeed, this conclusion is underscored by a comparison of the precise issues raised by the NFLMC on this appeal to the three Orders rendered by the district court below. As this comparison demonstrates, every single argument raised on appeal by the NFLMC relates to the first two Orders, from which the NFLMC never sought any appeal.

Specifically, the NFLMC complains that the district court:

(1) misconstrued that portion of the Award referring the pre-emption issue to the courts and erred in addressing pre-emption at all (NFLMC Br. at 23);

(2) failed to properly examine and apply the Preservation of Rights clause (NFLMC Br. at 25), and;

(3) should not have entered any judgment with respect to all NFL Clubs, as opposed to the three Clubs in the lawsuit (NFLMC Br. at 26).

Each of the above arguments, however, were decided in the district court's March 25, 2011 Order enforcing its Judgment.  It was <u>that</u> Order which declared the pre-emptive effect of the Award and addressed all three of the issues identified above as forming the basis of this appeal.  <u>See</u> SPA1-4.  It was <u>that</u> Order that held "[t]he arbitrator expressly held that the preemptive effect of the Award was an issue to be decided by the Courts" and that "[t]he Court now holds that the Award preempts any attempts" to obtain dollar-for-dollar offsets.  <u>See</u> SPA3.  It was <u>that</u> Order where the district court reviewed the Preservation of Rights clause and Award Agreement and found that the NFLMC's argument based on the former was a "red herring" because, under the Award Agreement, "the Award applies as of 2010."  <u>See</u> SPA4.[2]  And it was <u>that</u> Order where the district court extended the relief to all NFL Clubs.  <u>See</u> SPA4 (enjoining all of "Management" which includes all NFL Clubs).

The NFLMC made the tactical choice not to appeal the March 25, 2011 Order and Judgment and it cannot rectify that failure by seeking to appeal now from an Order in which it prevailed against the NFLPA's motion for contempt and none of the issues on appeal were decided.  <u>See</u> <u>Goode v. Winkler</u>, 252 F.3d

---

[2] In fact, the Preservation of Rights clause and the Award Agreement were first construed by the Court even earlier, in March 26, 2009, when the district court confirmed the Award.  <u>See</u> A170-176.

242, 245-46 (2d Cir. 2001) (dismissing appeal because it was untimely under F.R.A.P. 4).

## II. THE DISTRICT COURT PROPERLY ENFORCED ITS JUDGMENT BECAUSE THE NFLMC AND CLUBS CONTINUED TO VIOLATE THE CONFIRMED AWARD.

Putting aside the untimeliness of the NFLMC's appeal of the issues decided in the district court's March 25, 2011 Order, there is no basis for the NFLMC to challenge the district court's authority to have taken actions to enforce its Orders in the face of the willful and continuing violation of the confirmed arbitration Award by the NFLMC and the Clubs who were bound by the Arbitration Award.

To begin with, "[a]s a general rule, once a federal court has entered judgment, it has ancillary jurisdiction over subsequent proceedings necessary to vindicate its authority and effectuate its decrees. This includes proceedings to enforce the judgment." Dulce v. Dulce, 233 F.3d 143, 146 (2d. Cir. 2000) (quotations and internal citations omitted). Indeed, "[e]very court that has the jurisdiction to render a particular judgment has the inherent power to enforce it." See 30 Am. Jur. 2d Executions § 3 (2010) (collecting cases). The power of the federal courts to enforce their own judgments derives from the grant of power to the judiciary in the Constitution. Riggs v. Johnson Cnty., 73 U.S. (6 Wall.) 166, 18 L.Ed. 768 (1867) ("The jurisdiction of a court is not exhausted by rendition of

judgment, but continues until that judgment shall be <u>satisfied</u> . . . . Process subsequent to judgment is as essential to jurisdiction as process antecedent to judgment, else the judicial power would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitution.") (emphasis in original).

It also cannot be disputed that an arbitral award, once confirmed by a court, becomes a judgment of the court, and is fully enforceable by that court. <u>See</u> Oehmke, 4 Commercial Arbitration § 134:11 (2010) ("After confirmation, an arbitration award that is reduced to a judgment will be enforced as any other judgment."). Indeed, a party generally seeks confirmation to convert an arbitral award, which is a contract right, into a judgment of the court "because he fears the losing party will not abide by the award" and "[a]rmed with a court order[,] the winning party has a variety of remedies available to enforce the judgment." <u>Florasynth, Inc. v. Pickholz,</u> 750 F.2d 171, 176 (2d Cir. 1984).[3]

---

[3] In fact, the NFLPA sought confirmation of the Award presciently because it was fearful that the NFLMC and the Clubs, having arbitrated and re-arbitrated this issue for over two decades, would seek to evade the Award. <u>See</u> DE-22, at 28:25-29:5 (The Court: "[The NFLPA's counsel's position is that] he has a reasonable fear that the management will revert to its prior practices [of seeking dollar-for-dollar offsets] and he wants to forestall that"); DE-22, at 38:17-25 (Mr. Kaiser: "We have an award and we want it confirmed so that it is binding on the parties in future matters. Until it's confirmed as an award and a judgment, it is just an arbitration award. That's the whole purpose of confirming it in a judgment, as the Second Circuit said in the <u>Florasynth</u> case . . . You're entitled to [confirmation] because he fears the losing party will not abide by the award").

The decision in <u>Zeiler v. Deitsch</u>, 500 F.3d 157, 170 (2d. Cir. 2007), is directly on point. There, the district court ordered enforcement of a confirmed arbitration award after judgment was entered. This Court explained that federal courts have the power to enforce their judgments, including judgments that are derived from arbitral awards:

> Once confirmed, the awards become enforceable court orders, and, when asked to enforce such orders, a court is entitled to require actions to achieve compliance with them. In the pending case, after judgment was entered . . . [the winning party] moved for an order requiring [the losing party] to comply with the . . . judgment and provide [the winning party] with an accounting. . . . It was entirely permissible for the Court to enforce its judgment by requiring an accounting . . . in order to implement the judgment.

<u>Id.</u> at 170 (internal quotations omitted).[4]

---

[4] <u>See</u> <u>also</u> <u>Avon Prods. v. Solow</u>, 215 A.D.2d 247, 626 N.Y.S.2d 493 (1st Dep't 1995). In that case, an arbitrator issued an award in favor of the plaintiff determining certain wage rate escalations. The arbitral award was confirmed. When the defendant tried to implement different escalations more than a year after the award was confirmed, the plaintiff moved to enjoin the defendant from doing so. The appellate court held that such an injunction was a proper exercise of power by a trial court to enforce its own judgment confirming an award. <u>Avon Prods.</u>, 215 A.D.2d at 248, 626 N.Y.S.2d at 493 ("the court's grant of injunctive relief, enjoining defendant from disobeying the court's prior order and judgment, was patently proper"). The court also rejected defendant's argument that a new arbitration was necessary to resolve issues of compliance under the confirmed award: "Defendant is not permitted to force plaintiff to rearbitrate the same dispute that has already been definitively resolved against defendant for all years." <u>Id.</u>

Further, and contrary to the arguments of the NFLMC, in the context of enforcing a judgment that derives from a confirmed arbitral award, the district court has the authority to review the award, construe it, and enforce it. San Francisco Elec. Contractors Ass'n Inc. v. Int'l Bhd. of Elec. Workers, Local No. 6, 577 F.2d 529, 534 (9th Cir. 1978) ("If, as we have held, the court is to have authority to enforce the award, it must have the authority to construe it. To hold otherwise would in effect deny the court the power to enforce, since every effort made in that direction would successively and interminably require further arbitration.").

In addition to its inherent power to enforce and construe its own judgments, the district court had the power to enforce its judgments against the NFLMC and the Clubs pursuant to two separate statutes. First, because the first Order of the Court resulted in a declaratory judgment, the district court had the power, under 28 U.S.C. § 2202, to grant any "further necessary or proper relief" to enforce its declaratory judgment. Second, the All Writs Act, 28 U.S.C. § 1651, provides that "all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." The All Writs Act is broad and authorized the district court to issue all necessary or appropriate orders to enforce its judgments against the NFLMC and the Clubs without requiring the NFLPA to commence a

new arbitration.  <u>United States v. N.Y. Tel. Co.</u>, 434 U.S. 159, 172 (1977) ("This Court has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained:  This statute has served since its inclusion, in substance, in the original Judiciary Act as a legislatively approved source of procedural instruments designed to achieve the rational ends of law.") (citations and quotations omitted).

The NFLMC cites no authority for its extraordinary claim that a district court cannot enforce its own judgment confirming an arbitral award so that the prevailing party's only remedy for non-compliance with a judicially confirmed arbitral award is to commence another arbitration.  Rather, it cites inapposite cases, like <u>Ottley v. Schwartzberg</u>, 819 F.2d 373 (2d Cir. 1987), which hold that courts may not award additional remedies not contemplated by the arbitral award, usually monetary, that are distinct and separate from the underlying arbitral award.  <u>Ottley</u>, for example, involved a claim for damages under ERISA that was distinct from, and in addition to, the underlying arbitral award.  <u>See Ottley</u>, 819 F.2d at 376-77 ("[W]e must dispose of the ERISA claims for damages joined in the confirmation petition.  Petitioner requested that the district court order respondents to pay damages permitted under ERISA in the event that they oppose confirmation.").

That is nothing like the case here, where the district court was asked to issue an injunction enforcing the Award's clear interpretation of Paragraph 10.

Zeiler and Webb, which the NFLMC cite on page 21 of its brief, actually support the district court's decision to issue an injunction and rule on the pre-emption issue in order to achieve compliance with the confirmed Award. See Zeiler, 500 F.3d at 170 ("Once confirmed, the awards become enforceable court orders, and, when asked to enforce such orders, a court is entitled to require actions to achieve compliance with them."); Robert Lewis Rosen Assocs., Ltd. v. Webb, 473 F.3d 498, 506 (2d Cir. 2007) (award included prospective relief and thus the district court properly orders damages because "such award was specifically contemplated by the underlying arbitration."). Again, Arbitrator Das expressly held that "the courts" must decide the pre-emption issue, and that is precisely what the district court did when it enforced the confirmed Award that the Clubs continued to violate. As to the third decision cited by the NFLMC -- Bottini v. Sadore Mgmt. Corp., 764 F.2d 116 (2d Cir. 1985) -- it is nothing like this case. Rather, like the decision in Ottley, Bottini involved a claim that was separate and distinct from the underlying arbitral proceeding. See id. at 120-21 ("[T]he arbitration award in the instant case gives no indication that any evidence was submitted to or considered by the arbitrator" regarding plaintiff's Title VII claim

and an "arbitration proceeding does not supplant the comprehensive statutory scheme of Title VII . . . .").

Nor was it improper for the district court to rule upon the pre-emptive force of the arbitral Award against inconsistent state laws, as this legal determination under the federal labor laws was well within the district court's authority to enforce the Award in the face of claims by the NFLMC and the Clubs that the Award had no such effect. Indeed, Arbitrator Das stated in the Award that it would be up to the courts to determine the pre-emptive effect of the Award, as he believed it was not the role of the CBA arbitrator to determine such an external legal issue. See A62. As in Zeiler, the district court here issued a ruling on the pre-emption issue in order to achieve compliance with the Award, Judgment and Order. See Zeiler, 500 F.3d at 170 ("Once confirmed, the awards become enforceable orders, and, when asked to enforce such orders, a court is entitled to require actions to achieve compliance with them.").

The NFLMC acknowledges, as it must, that Arbitrator Das ruled that the pre-emptive effect of the Award "is a matter to be decided in the appropriate state or federal forum." See NFLMC's Br. at 23 (citing A62). On its face, this disposes of the NFLMC's argument that the district court enlarged the scope of the Award. To the contrary, all that the district court did was to determine the necessary and appropriate means to enforce the confirmed Award in the face of

claims by the NFLMC and the Clubs that they did not have to comply with the Award because of inconsistent state laws. There was, in fact, no way for the district court to determine the enforcement issue without resolving the issue of the Award's pre-emptive effect. Indeed, the Arbitrator's determination, binding on the NFLMC and the Clubs, that the pre-emptive effect of the Award and Paragraph 10 had to be decided by the courts, as opposed to the CBA arbitrators, negates any claim that additional arbitration is necessary (or even possible) to address the issue of pre-emption.

In the face of this express language in the arbitral Award, there is no basis for the NFLMC's ipse dixit assertion that the Arbitrator "did not by any means" believe that the pre-emption issue "could be reached by a federal district court in the process of confirming or enforcing the Award." See NFLMC Br. at 23. Arbitrator Das, the NFLMC contends, must have intended for dozens of different state workers' compensation judges to decide pre-emption on a case-by-case, forum-by-forum basis, so that, at the end of the day, there would continue to be an inconsistent patchwork of court decisions and arbitral awards, with different NFL players and different NFL Clubs having a different set of rights under Paragraph 10. Not only is this assertion by the NFLMC, that mass confusion and uncertainty is required, completely unsupported, it is the exact opposite result mandated by the Supreme Court decisions on federal labor law pre-emption which

empower the federal courts to declare the term of a CBA to pre-empt any inconsistent state laws so that there can be uniform federal labor benefits provided to workers. See <u>Allis Chambers Corp. v. Lueck</u>, 471 U.S. 202, 209-210 (1985) (Courts must apply "federal common law" in interpreting CBA because "in enacting § 301 [of the LMRA] Congress intended doctrines of federal labor law uniformly to prevail over inconsistent local rules."); <u>see</u> <u>also</u> <u>infra</u> Argument, Section III.

There is simply nothing in the Award to preclude a federal court, in the context of confirming and enforcing the Award, to determine its pre-emptive effect against inconsistent state laws. In fact, the district court was required to make this determination in light of the position by the NFLMC and the Clubs that they were free to violate the Award to seek inconsistent state law offsets. The issue of pre-emptive effects of the Award was properly left to the courts, and it is the federal district court, not a state workers' compensation tribunal, that is in the best position to determine the scope of federal labor law pre-emption. See <u>Allis Chambers Corp.</u>, 471 U.S. at 211 ("[Q]uestions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law . . . .").

There is simply no basis for the NFLMC's position that state workers' compensation tribunals should decide these issues on a case-by-case basis, with no assurance of consistency, to the exclusion of a federal court that can make one binding determination in the context of enforcing the confirmed arbitral Award. Allowing state workers' compensation tribunals to resolve federal labor law pre-emption issues on a case-by-case basis would undermine federal labor law, which requires the uniform application of federal law. Allis Chambers Corp., 471 U.S. at 211.

Nor can there be any doubt that the district court below, in issuing the injunction and other Orders, was determining a live controversy. The NFLMC and Bills continued to argue, despite the Orders, that Clubs were entitled to seek dollar-for-dollar offsets under state laws. See DE-41, at ¶¶ 10-11, Exhs. C & D. Indeed, the Bills even argued to state workers' compensation tribunals that the district court's permanent injunction was irrelevant:

> Nothing changed just because [Arbitrator Das's] decision was certified by Judge Crotty and now he has issued an order.

DE-41, Exh. C, at 6:12-6:14.

In the face of the above acts of defiance, it was entirely proper for the district court to resolve this live controversy and to issue an injunction which also determined the pre-emptive effect of its Orders confirming and enforcing the labor

arbitral Award. See, e.g., Zeiler, 500 F.3d at 170; San Francisco Elec. Contractors Ass'n Inc., 577 F.2d at 534.

There is similarly no merit to the NFLMC's argument that "the District Court also exceeded its jurisdiction in interpreting the Preservation of Rights Clause." See NFLMC Br. at 24. First, as discussed in Point I above, the NFLMC is precluded from raising this untimely attack upon the district court's actions because of the district court's treatment of the Preservation of Rights clause, like the issue of pre-emptive effect, was decided in its first and second Orders, from which no appeal was ever taken. Second, Arbitrator Das already considered the impact of the Preservation of Rights clause in the course of rendering the arbitral Award and there is thus no basis for the NFL's assertion that another arbitration to consider this clause is required. To the contrary, having the Preservation of Rights Clause presented squarely before him, Arbitrator Das ruled that the issue of the pre-emptive effect of Paragraph 10 and the arbitral Award was for the courts, not the CBA arbitrators, to determine. Third, as the district court properly recognized, the Award Agreement made the Preservation of Rights clause inapplicable to the Award at issue. While the NFLMC does not want to address the Award Agreement, there can be no dispute that it is a binding labor agreement between the parties in which it was specified that, starting in the Final League Year, the Award would be binding on the NFLMC and all Clubs "notwithstanding"

the Preservation of Rights clause of the CBA.  <u>See</u> A87-88.  Fourth, any additional

arbitration of this issue would be pointless, as Arbitrator Das has already ruled,

after considering the Preservation of Rights clause arguments of the NFLMC, that

the Award's pre-emptive effect must be determined by the courts.[5]

Finally, there is equally no merit to the NFLMC's claim that the

district court exceeded its jurisdiction by enjoining all Clubs, and not just the Clubs

whose specific actions were at issue in the Award (NFLMC Br. at 26).  Not only is

the NFLMC's attempt to appeal this issue untimely, as it was squarely addressed in

the second order from which no appeal was taken, it is wrong as a matter of law.

Indeed, the CBA, and the rulings of the CBA arbitrators under it, are expressly

binding on all parties to the CBA.  <u>See</u> A96.  Further, with respect to the specific

Award at issue here, the Award Agreement provides that the Award will "be

binding upon the Players and Clubs <u>and the parties to the Agreement</u> as set forth in

---

[5] The NFLMC's argument (NFLMC Br. at 29) that the Preservation of Rights Clause is still applicable because "the Players Association itself asked Arbitrator Das to interpret the [Award] Agreement" again in an April 2010 grievance against the Cleveland Browns is meritless.  The only reason the April 2010 grievance was filed was because the district court had not yet ruled on the NFLPA's request for an injunction.  The Cleveland Browns were then seeking a dollar-for-dollar offset in violation of Paragraph 10, and a party under the CBA was required to commence a grievance within 45 days after the event giving rise to the arbitration occurs.  Once the district court granted the injunction against all of the NFL Clubs, the Cleveland grievance became moot and the need for any further consideration of the Award Agreement and the Preservation of Rights clause, which has already been ruled upon by Arbitrator Das, was at an end.

CBA art. IX, sec. 8, as amended." A87-88 (emphasis added). CBA Art. IX, Sec. 8 says that "[t]he decision of the arbitrator will constitute the full, final and complete disposition of the grievance, and will be binding upon the player(s) and Club(s) involved <u>and the parties to this Agreement</u>." A96 (emphasis added). All NFL Clubs are parties to the CBA, because the CBA is between the NFLPA and the NFLMC, and the NFLMC serves as the "sole and exclusive bargaining representative of present and future employer member Clubs of the National Football League." DE-32, Exh. A, at 1. The confirmed Award thus applies to all Clubs, and the district court properly issued an injunction to enforce the Award against all Clubs.

## III. THE DISTRICT COURT PROPERLY DETERMINED THAT THE AWARD AS CONFIRMED PRE-EMPTS INCONSISTENT STATE LAW.

It is well-settled that where a state law (such as a workers' compensation statute) is inconsistent with a federally sanctioned CBA, as here, the state law is pre-empted to the extent it provides for lesser benefits to employees than the CBA. <u>See</u>, <u>e.g.</u>, <u>Alessi v. Raybestos-Manhattan, Inc.</u>, 451 U.S. 504, 525-26 (1981) (New Jersey workers' compensation law pre-empted by collective

bargaining agreement).[6] The rationale for this rule of pre-emption is derived from the core of federal labor law. Congress's purpose in enacting the National Labor Relations Act ("NLRA") was to remedy "[t]he inequality of bargaining power between employees . . . and employers" by promoting collective bargaining. See 29 U.S.C. § 151; see also Met. Life Ins. Co. v. Mass. Travelers Ins. Co., 471 U.S. 724, 753-54 (1985). The strong federal policy favoring the ability of workers to unionize, and peacefully bargain for benefits, cannot be undermined by state laws that may be inconsistent with and undermine such bargained-for benefits. Hence, federal courts have consistently ruled that state laws may not alter the substantive terms of a CBA to reduce benefits won by workers at the bargaining table. See, e.g., Lodge 76, Int'l Ass'n of Machinists and Aerospace Workers v. Wis. Emp. Relations Comm'n, 427 U.S. 132 (1976) ("Machinists"); Local 24 of the Int'l Bhd. of Teamsters v. Oliver, 358 U.S. 283 (1959) ("Oliver"); see also Derrico v.

---

[6] Alessi dealt with a New Jersey workers' compensation law that purported to prohibit private pension plans from offsetting pension benefits by the amount of any workers' compensation awards. The Court held that the NLRA pre-empted application of the inconsistent provisions of the state workers' compensation laws to the collective bargaining agreement at issue:

> Where, as here, the pension plans emerge from collective bargaining, the additional federal interest in precluding state interference with labor-management negotiations calls for pre-emption of state efforts to regulate pension terms. As a subject of collective bargaining, pension terms themselves become expressions of federal law, requiring preemption of intrusive state law.

Alessi, 451 U.S. at 525-26 (emphasis added).

Sheehan Emergency Hosp., 844 F.2d 22, 24 (2d Cir. 1988) ("Any state law claim Derrico might state . . . would be so intertwined with the terms of the expired CBA that federal interests in uniform interpretation of collectively bargained contracts would be significantly compromised."). Where, as here, a provision of the CBA – Paragraph 10 as interpreted by the CBA Arbitrator – provides for greater employee benefits, the district court quite properly held that any inconsistent state laws are pre-empted.[7]

In Machinists, a seminal Supreme Court decision applying the federal labor law pre-emption doctrine, the Court held that conflicting state law is pre-empted by the NLRA when it seeks to regulate what Congress intended to be controlled by the "free play of economic forces." Machinists, 427 U.S. at 140. As explained by the Supreme Court:

---

[7] See also Nelson v. Victory Elec. Works, Inc., 338 F.2d 994 (4th Cir. 1964), aff'g 227 F. Supp. 404, 406 (D. Md. 1964) (collective bargaining agreement provision whereby the employer agreed to provide workers' compensation benefits equivalent to those provided in the District of Columbia even when the employees were injured while working outside of the District held to govern injury suffered in Maryland despite inconsistent Maryland workers' compensation laws, which provided that "[n]o employer or employee . . . shall exempt himself from the burden or waive the benefit of this article by any contract . . ."). As explained by the Nelson court: "it is entirely competent for an employer and an employee by express contract to supplement benefits under the Act or to relax its restrictions or requirements in favor of the employee." Nelson, 227 F. Supp. at 407, aff'd 338 F.2d 994 (4th Cir. 1964) (citation omitted); Tampa Bay Area NFL Football, Inc. v. Jarvis, 668 So. 2d 217, 219 (Fla. Dist. Ct. App. 1996) ("While the collective bargaining agreement refers to coverage under the 'compensation laws,' this does not preclude the parties from contractually expanding the coverage or benefits which would otherwise pertain under the workers' compensation statutes").

> Our decisions . . . have made it abundantly clear that state attempts to influence the substantive terms of collective-bargaining agreements are . . . inconsistent with the federal regulatory scheme . . . Since the federal law operates here, in an area where its authority is paramount, to leave the parties free, the inconsistent application of state law is necessarily outside the power of the State.

Id. at 153 (citing Oliver).

Pursuant to Machinists, issues resolved at the bargaining table become the law of the parties, unalterable by inconsistent state laws which reduce worker benefits. Because Paragraph 10 is the result of a federally sanctioned collective bargaining process, the agreement itself has the imprimatur of federal labor law and thus pre-empts inconsistent state laws. See, e.g., Hull v. Dutton, 935 F.2d 1194, 1196-97 (11th Cir. 1991) ("It is well-settled that 'a union agreement made pursuant to the [federal statute] has . . . the imprimatur of the federal law upon it and, by force of the Supremacy Clause . . . could not be made illegal nor vitiated by any provisions of the laws of a State.") (citing Railway Employees' Dep't v. Hanson, 351 U.S. 225, 232 (1956)).

Nor can there be any doubt that the subject of workers' compensation was a proper subject of collective bargaining, as the NLRA makes everything related to "wages, hours, and other terms and conditions of employment" a subject of mandatory bargaining between the union and employer. See 29 U.S.C. 158(d). Not surprisingly, issues pertaining to the payment of salary during periods of

disability, and the ability of an employer to seek reimbursement of such salary from a workers' compensation award, are often dealt with at the bargaining table. See, e.g., In re Kohler Mix Specialties, Inc., 332 N.L.R.B. No. 61, at *4 (N.L.R.B. Sept. 29, 2000) (workers' compensation is a subject of mandatory bargaining); In re Jones Dairy Farm, 295 N.L.R.B. 113, at *11 (N.L.R.B. June 15, 1989) (same). Thus, if parties to a CBA make an agreement with respect to workers' compensation rights and offsets, it will pre-empt any inconsistent state law that provides lesser rights to employees.[8]

In this case, Arbitrator Das squarely ruled that "Paragraph 10 of the NFL Player Contract provides only for a time offset, and not for a dollar-for-dollar

---

[8] The NFLMC's claim that Section 301 pre-emption -- rather than Machinists pre-emption -- applies is incorrect. Machinists pre-emption applies whenever a CBA provides for greater benefits to workers than the benefits provided under state law. Compare Machinists, 427 U.S. at 153 ("Our decisions . . . have made it abundantly clear that state attempts to influence the substantive terms of collective-bargaining agreements are . . . inconsistent with the federal regulatory scheme.") with Met. Life, 471 U.S. at 753, 755-56 (Machinists pre-emption does not apply if a state law provides greater benefits: "It would turn the policy that animated the Wagner Act on its head to understand it to have penalized workers who have chosen to join a union by preventing them from benefiting from state labor regulations imposing minimal standards on nonunion employers."). None of the cases cited by the NFLMC suggest otherwise. The decision in Rondout Electric, Inc. v. NYS Department of Labor, 335 F.3d 162, 167 (2d Cir. 2003), holds that Machinists pre-emption applies where a state regulation affects the bargaining process. This is also the case here, because the NFL players negotiated for greater benefits to protect themselves from state workers compensation laws, such as New York's statute, that provide for larger offsets of workers' compensation benefits than the parties have bargained for in the NFL. There was no reason for the NFLPA to bargain for Paragraph 10 except to prevent the application of state laws that provide lesser benefits.

offset; that this is a benefit or right to the player, as well as the Club; and that this is the law of the shop under this CBA and is binding on all the Clubs." A63. This provision of the CBA, as interpreted by the CBA arbitrator and embodied in a confirmed arbitral Award, is clearly entitled to pre-emptive effect under the Machinists line of authority.[9]

Significantly, prior to the Award, different state courts interpreted Paragraph 10 differently, with one state court, for example, interpreting it to provide only a limited time offset and displacing state law allowing for a greater offset, see, e.g., Tampa Bay Area NFL Football, Inc. v. Jarvis, 668 So. 2d 217 (Fla. Dist. Ct. App. 1996), and another state court construing it to provide a dollar-for-dollar offset, see, e.g., Green v. New Orleans Saints, 781 So. 2d 1199 (La. 2000). In cases like Green, where state courts interpreted Paragraph 10 in a manner inconsistent with arbitral precedent, the courts erroneously held that they were not bound by arbitral precedent but rather were free to interpret Paragraph 10 anew. Green, 781 So. 2d at 1203 (noting Arbitrator Kagel's arbitral precedent, rejecting it and adopting its own interpretation that it was "consistent" that Louisiana's dollar-

---

[9] The NFLMC's suggestion that the Award Agreement was raised for the first time in the NFLPA's reply brief is untrue. NFLMC Br. at 28. The NFLMC submitted the Award Agreement to the district court as an exhibit to the Declaration of Stacey Eisenstein (the NFLMC's counsel), dated July 7, 2008, and the NFLPA relied on it to oppose the NFLMC's argument concerning the Preservation of Rights Clause. What is more, that briefing was in connection with the second order, thus underscoring that this appeal really challenges that order and hence is untimely.

for-dollar offset).  These divergent and inconsistent interpretations of Paragraph 10 undermined the important goals of federal labor law.  See Allis Chambers Corp., 471 U.S. at 211("Were state law allowed to determine the meaning intended by the parties in adopting a particular contract phrase or term . . . [t]he parties would be uncertain as to what they were binding themselves to when they agreed to create a right to collect benefits under certain circumstances.  As a result, it would be more difficult to reach agreement, and disputes as to the nature of the agreement would proliferate.").

Further, cases like Green ignored the fundamental tenet of federal law that courts are bound by a labor arbitrator's merits interpretation of a CBA as long as it is consistent with the essence of the agreement and does not otherwise violate arbitral requirements.  See, e.g., Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 562-63 (1976) ("Courts are not to usurp those functions which collective bargaining contracts have properly entrusted to the arbitration tribunal . . . but should defer to the tribunal chosen by the parties finally to settle their disputes."); Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 510 (2001) ("even 'serious error' on the arbitrator's part does not justify overturning his decision, where, as here, he is construing a contract and acting within the scope of his authority").

Indeed, an arbitrator's award interpreting a collective bargaining agreement becomes "part of the agreement and may not be relitigated." Zack & Block, Labor Arbitration in Negotiation and Arbitration, at 61 (2d ed. 1995); see also Air Line Pilots v. Delta Air Lines, 863 F.2d 87, 93 (D.C. Cir. 1988), cert. den. 493 U.S. 821 (1989) ("arbitrator's decision generally becomes part of the contract"); Eagle Iron Works v. Int'l Ass'n of Machinists, No. 4-01-CV-90159, 2001 WL 1678741, at *5 (S.D. Iowa Nov. 26, 2001) ("an award interpreting a collective bargaining agreement usually becomes a binding part of the agreement"). This is the essence of federal labor law:

> A collective bargaining agreement is an effort to erect a system of industrial self-government . . . the grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government. Arbitration is the means of solving the unforeseeable by molding a system of private law for all the problems which may arise and to provide for their solution in a way which will generally accord with the variant needs and desires of the parties. The processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement. . . . The grievance procedure is, in other words, a part of the continuous collective bargaining process.

United Steelworkers of Am. v. Warrior and Gulf Navigation Co., 363 U.S. 574, 580-81 (1960). See also Elkouri & Elkouri, How Arbitration Works 579 (Alan Miles Rubin ed., BNA Books 6th ed. 2003) (this fundamental principle of labor law derives from the fact that "'collective bargain' implies that the terms and

conditions of employment will be uniform for all similarly situated employees in the bargaining unit" and that "[t]he terms of a contract should not mean one thing to one employee and something else to another"). Arbitral awards bind all parties to the labor agreement:

> Where a prior decision involves the interpretation of the identical contract provision, between the same company and the same union, every principle of common sense, policy, and labor relations demands that it stand until the parties annul it by a newly worded contract provision.

Trailways Lines, Inc. v. Trailways, Inc. Joint Council, 807 F.2d 1416, 1425 (8th Cir. 1986) (internal quotations omitted). Here, not only has Paragraph 10 never been annulled, it was repeatedly ratified and reaffirmed by the parties when the CBA was extended after 1993 without any change to Paragraph 10.

The district court was thus entirely correct in determining that the Award bound all NFL Clubs and prevented them from seeking inconsistent state law offsets; any other decision would have violated basic principles of federal labor law and deference to labor arbitral awards. And, the district court was, in accordance with these fundamental principles of labor law, empowered to rule that the Award pre-empted inconsistent state law, so that state courts would not, as in Green, simply disregard arbitral precedent and the supremacy of federal labor law.

The NFLMC argues that pre-emption does not apply because the right to an offset under New York state law does not require a workers' compensation

tribunal to examine Paragraph 10, or the CBA. But that argument has nothing to do with <u>Machinist</u> pre-emption. It is precisely because the CBA, as interpreted by Arbitrator Das, provides for greater worker benefits that any state law that provides for dollar-for-dollar offsets is pre-empted. State courts are not permitted to undermine such collectively bargained rights by simply closing their eyes to the CBA agreement that the parties have entered into pursuant to federal labor law, which requires that inconsistent state laws be pre-empted. Avoiding the "evils" of inconsistent state court interpretations of a collective bargaining agreement is one of the bases for Supreme Court precedent requiring the exclusive application of federal law to interpret and apply such agreements and pre-empting any state law that would undermine a collectively bargained-for right. <u>See</u>, <u>e.g.</u>, <u>Allis Chambers Corp.</u>, 471 U.S. at 211; <u>Teamsters v. Lucas Flour Co.</u>, 369 U.S. 95, 103 (1962).

Indeed, the NFLMC itself has taken this exact same position on federal labor law pre-emption, and in virtually identical circumstances. In connection with negotiating the 2006 CBA, NFL Clubs located in Ohio recognized that the CBA provisions regarding workers' compensation would be inconsistent with several aspects of Ohio's workers' compensation law. To make sure that the Ohio tribunals knew about the CBA requirements and their pre-emptive effect, the NFLMC and NFLPA submitted a joint letter to Ohio regulators regarding the interplay between state workers' compensation laws and the NFL CBA. DE-59,

Exh. A. The letter is written on the letterheads of both the NFLMC and NFLPA and was signed by the General Counsels of both institutions. In the letter, the NFLMC and NFLPA made clear that if "any . . . provision of the Ohio workers' compensation laws [] were somehow deemed to be in conflict with the new CBA provisions, the application of such state law(s) would have to give way to the application of the terms of the CBA pursuant to firmly-settled principles of labor law." DE-59, Exh. A, at 4 (emphasis added). The letter then cites all of the same Machinists pre-emption cases that the NFLPA cited to the district court and herein. The section of the letter concludes: "Therefore, if an Ohio law . . . precluded NFL Players from receiving this collectively bargained benefit, that law would likely be preempted." Id. (emphasis added). It ill behooves the NFLMC and the Clubs to now come before this Court in an effort to disavow its prior positions on pre-emption and take the position that the workers' compensation provisions of the NFL CBA do not have pre-emptive effect. This Court should affirm the district court on this well-established pre-emption doctrine, which even the NFLMC recognized to be the law when it was presenting its position to the Ohio workers' compensation authorities at a time before the Arbitrator Das decision interpreting Paragraph 10 was disclosed.

## CONCLUSION

For all of the foregoing reasons, the NFLPA respectfully requests this Court to either dismiss the NFLMC's appeal for being untimely or to affirm the district court's decision below.


August 14, 2012                    Respectfully submitted,


                                    _s/ Jeffrey L. Kessler_____

                                    Jeffrey L. Kessler
                                    Adam J. Kaiser
                                    Jeffrey H. Newhouse
                                    WINSTON & STRAWN LLP
                                    200 Park Ave.
                                    New York, New York 10166-4193
                                    Telephone:  (212) 294-6700
                                    Facsimile:  (212) 294-4700

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(A)</u>

I certify, pursuant to Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 32.1, that the foregoing brief is proportionally spaced, has a typeface of 14 points, and contains 12,875 words.


August 14, 2012                                         s/ Jeffrey L. Kessler
                                                       Jeffrey L. Kessler

STATE OF NEW YORK    )
                     )        ss.:        **AFFIDAVIT OF**
COUNTY OF NEW YORK   )                    **CM/ECF SERVICE**


      I, Melissa Pickett, being duly sworn, depose and say that deponent is not a party to the action, is over 18 years of age.

      **On**

deponent served the within:  **Brief for Petitioner-Appellee**

      **upon:**

**Akin Gump Strauss Hauer & Feld LLP**
**2029 Century Park East, Suite 2400**
**Los Angeles, CA  90067**
**(310) 229-1000**

        **-and-**

**Akin Gump Strauss Hauer & Feld LLP**
**1333 New Hampshire Avenue, N.W.**
**Washington, DC  20036**
**(202) 887-4000**

**Attorneys for Respondent**

via the CM/ECF Case Filing System. All counsel of record in this case are registered CM/ECF users. Filing and service were performed by direction of counsel.

**Sworn to before me on**

_____

     **MARIA MAISONET**
    Notary Public State of New York
      No. 01MA6204360
     Qualified in Bronx County
Commission Expires Apr. 20, 2013        **Job # 243095**